UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE RAKOFF

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

VITESSE SEMICONDUCTOR CORPORATION,
LOUIS R. TOMASETTA, EUGENE F. HOVANEC,
YATIN D. MODY, AND NICOLE R. KAPLAN

Defendants.

---

No. 10 Civ. **10 CIV 9239**

**COMPLAINT AND
JURY DEMAND**

DEC 10 2010
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.      During the period in or about 1995 through April 2006, defendant Vitesse
Semiconductor Corporation ("Vitesse" or the "Company") engaged in fraudulent revenue
recognition practices and stock options backdating misconduct. This fraud was orchestrated by
certain of Vitesse's most senior former executives.

2.      Starting in or about September 2001 and not ending until April 2006, Vitesse
engaged in an elaborate channel stuffing scheme in order to improperly record revenue on
product shipments. Defendants Louis R. Tomasetta ("Tomasetta"), co-founder and former Chief
Executive Officer ("CEO") and director of Vitesse, Eugene F. Hovanec ("Hovanec"), former
Chief Financial Officer ("CFO") and Executive Vice-President of Vitesse, Yatin Mody, former
Controller and CFO, and Nicole Kaplan, former Manager and Director of Finance of Vitesse,
each knowingly played a significant role in the Company's execution of this fraud. Specifically,
Tomasetta, Hovanec, Mody and Kaplan caused the Company to immediately recognize revenue

and record invalid accounts receivable for product shipped at period end to its largest distributor, Nu Horizons Electronics Corporation, even though it had an unconditional right to return all of the product. The right of return was accomplished through undisclosed side letters and oral agreements. The effect of this fraud was to materially inflate the revenue that the Company reported in its financial statements in 14 quarters from September 2001 through early 2006.

3.     Tomasetta, Hovanec, Mody and Kaplan compounded their fraudulent revenue recognition practices by failing to timely record credits that were generated by Nu Horizons' return of product tied to the invalid accounts receivable.

4.     In order to conceal the true age of the accounts receivable created by the failure to timely record credits from the Company's external auditor ("Auditor"), Hovanec and Kaplan then directed that cash receipts received by Vitesse from Nu Horizons and other customers be misapplied to these aged invalid receivables. Some of the cash received from Nu Horizons, in the form of prepayments, was used to camouflage the aged receivables. Hovanec personally negotiated the amount of these prepayments.

5.     From 1995 to 2006, Tomasetta and Hovanec also engaged in a scheme to backdate stock option grant dates for their personal benefit and the benefit of other Vitesse executives and employees. Tomasetta and Hovanec intentionally selected grant dates that were days, weeks, and months in the past. Tomasetta and Hovanec used option grant dates that were different from the dates on which Vitesse's Compensation Committee had actually approved and granted the options. Tomasetta and Hovanec disregarded the Compensation Committee's approval dates because they wanted to pick trading dates for the grants that coincided with low points in the Company's stock price. Those favorable prices were used as the exercise prices for

2

the options. Tomasetta and Hovanec also used hindsight to reprice option grants as Vitesse's stock price declined.

6.      In total, Tomasetta and Hovanec backdated or repriced 40 option grants to thousands of employees. These options represented over 60% of the total options that Vitesse awarded from 1995 to 2006 to newly hired and existing employees and officers. Tomasetta and Hovanec collectively reaped millions of dollars in illicit profits from exercising backdated options. Despite representing in Vitesse's periodic filings made with the Commission that the Company did not grant in-the-money options and complied with applicable accounting rules, Tomasetta and Hovanec intentionally manipulated grant dates in order to award in-the-money options and failed to ensure that Vitesse properly recorded compensation expenses for the backdated grants. As a result of the backdating, Vitesse failed to record approximately $184 million in compensation expense, overstating its pretax income or understating its pretax loss by as much as 45% annually for its fiscal years 1996 through 2005.

7.      In addition, after the *Wall Street Journal* (*"Journal"*) questioned Vitesse in November 2005 about the legitimacy of its option granting practices, Tomasetta and Hovanec engaged in a cover up to hide some of their prior option backdating misconduct. Between November 2005 and April 2006, Tomasetta and Hovanec lied to Vitesse board members and to Vitesse's Auditor by falsely telling them that past option grants were proper and correctly accounted for in the Company's books.

8.      In furtherance of their cover-up, Tomasetta and Hovanec also fabricated minutes of two non-existent 2001 meetings during which Vitesse's Compensation Committee purportedly granted stock options. Tomasetta and Hovanec inserted these fabricated minutes into the stock option administrator's computer and turned back the clock on the computer thereby creating the

3

false appearance that the minutes had been written at the same time as when the purported meetings occurred. During an interview of Tomasetta by Vitesse's attorneys, who had begun an internal investigation, Tomasetta admitted to these lawyers that he had told Hovanec and Mody that this conduct "is the Martha Stewart thing, this is dumb, we need to stop - we're going to go to jail."

9.     Tomasetta also inserted the dates of these two fictional meetings into his Palm Pilot thereby creating the façade that these two phantom meetings had actually happened. Additionally, on or about December 2005, Hovanec directed his assistant to create a third set of fabricated Compensation Committee meeting minutes to falsely substantiate another backdated grant date from 2003.

10.     Based on its conduct, Vitesse engaged in acts, practices and courses of business that violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B), 78n(a)] and Exchange Act Rules 10b-5, 13a-1, 13a-13, 12b-20, and Rule 14a-9 [17 C.F.R. §§ 240.10b-5, 240.13a-1, 240.13a-13, 240.12b-20, 240.14a-9].

11.     Based on their conduct, defendants Tomasetta and Hovanec each engaged in acts, practices and courses of business that violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), and 16(a), and of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5), and 78p(a),] and Exchange Act Rules 10b-5, 13a-14, 13b2-1, 13b2-2, and 16a-3 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, 240.13b2-2, and 240.16a-3]. Tomasetta also violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

12.     Based on their misconduct, defendants Mody and Kaplan engaged in acts, practices and courses of business that violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Exchange Act Rules 10b-5, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2]. Mody also violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

13.     In addition, Tomasetta, Hovanec, Mody, and Kaplan each aided and abetted Vitesse's violations of Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.13b-20, 240.13a-1 and 240.13a-13].

14.     Unless enjoined, defendants Vitesse, Tomasetta, Hovanec, Mody and Kaplan are likely to commit such violations in the future. Vitesse, Tomasetta, Hovanec, Mody and Kaplan should be permanently enjoined from doing so. In addition, defendants Tomasetta, Hovanec, Mody and Kaplan should be ordered to disgorge any ill-gotten gains or benefits derived as a result of these violations and prejudgment interest thereon, and be ordered to pay civil monetary penalties. Further, defendants Tomasetta, Hovanec, and Mody respectively should be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)].

## JURISDICTION AND VENUE

15.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. The defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce, of the mails, or of the

facilities of a national securities exchange in connection with the acts, transactions, practices and courses of business alleged in this Complaint.

16.    Venue is proper pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts alleged herein constituting violations of the Securities Act and the Exchange Act occurred in this District, including trading in the shares of Vitesse on the Nasdaq National Market and because certain shareholders of Vitesse were located in this District.

## DEFENDANTS

17.    **Vitesse Semiconductor Corporation** is a major producer of high-performance integrated circuits for use primarily by systems manufacturers in the storage and communications industries. Vitesse was incorporated in Delaware in 1987, is headquartered in Camarillo, California, and maintains a September 30th fiscal year-end. Vitesse's quarters respectively end on December 31st, March 31st, June 30th, and September 30th. During the relevant period, the Company's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and traded on the Nasdaq National Market under the symbol VTSS. The Company's common stock is currently traded on the Pink Sheet System of Quotation under the symbol "VTSS.PK."

18.    Vitesse was unable to restate its historical financial statements to reflect the impact of the misconduct described in this Complaint. In September 2008, in its first periodic report filed with the Commission after discovering the fraud, Vitesse filed a Form 10-K for its fiscal years ended September 30, 2006 and 2007. Although its fiscal 2006 financial statements contain one restated quarter (the first quarter of 2006), Vitesse reported that it was unable to restate its financial statements prior to September 30, 2005, or estimate the financial impact of

the improper accounting and sale practices, because it could not rely on poor or non-existent accounting records and because key accounting controls were circumvented by management or did not exist. Vitesse included in this filing a "stock options restatement" ("Stock Options Restatement"), which recorded $268 million of adjustments for unrecorded compensation expenses from the Company's inception in 1987 through 2005. The Company's Form 10-K disclosed that its inability to provide audited financial statements for fiscal years prior to 2006 meant that it was not current in its Exchange Act reporting obligations. As set forth below, Tomasetta, Hovanec, Mody and Kaplan had all ceased working at Vitesse by May 2006.

19.     **Louis R. Tomasetta**, age 62, is a resident of Ojai, California. Tomasetta co-founded Vitesse in 1987. From 1987 until May of 2006, Tomasetta served as President, Chief Executive Officer, and as a Director of the Company; Tomasetta took the Company public in December 1991. On May 17, 2006, the Board of Directors of Vitesse terminated Tomasetta because of concerns regarding the integrity of documents evidencing the Company's stock option grant practices. In testimony during the Commission's investigation in this matter, Tomasetta asserted his Fifth Amendment privilege against self-incrimination.

20.     **Eugene F. Hovanec**, age 59, is a resident of Westlake Village, California. Hovanec became licensed as a Certified Public Accountant ("CPA") in 1976 in New York. His current license expires in 2011. At Vitesse, from December 1993 through April 2005, Hovanec served as Vice President of Finance and Chief Financial Officer. In April 2005, Hovanec was named Executive Vice President, relinquishing his role as CFO to Yatin Mody. Hovanec served as Executive Vice President until May 17, 2006 when he was terminated by the Board of Directors due to concerns regarding the integrity of documents evidencing the Company's stock

option grant practices. In testimony during the Commission's investigation in this matter, Hovanec asserted his Fifth Amendment privilege against self-incrimination.

21.     During his tenure at Vitesse, Hovanec also served from 1994 through 2007 as a director at Interlink Electronics, Inc., a U.S. public company. He served on both Interlink's Audit Committee and Compensation Committee throughout these years. For Interlink's fiscal years 2003 through 2006, Interlink's Board of Directors determined and disclosed that Hovanec was an audit committee financial expert within the meaning of the Commission rule promulgated under Section 407 of the Sarbanes-Oxley Act of 2002, Item 401(h) of Regulation S-K.

22.     From 1989 to 1993, Hovanec served as Vice President Finance & Administration, Chief Financial Officer, and Corporate Secretary and Treasurer at publically traded Digital Sound Corporation. Prior to that, from 1984 through 1989, he served as Vice President, Controller and Corporate Controller at Micropolis Corporation, a private company. From 1980 through 1984, Hovanec was a Division Controller at Eocom Electronic Systems, a division of Hoechst Celanese Corporation, and from 1976 through 1980, Hovanec's title was Corporate Special Projects at Hoechst Celanese Corporation, a German public company not listed in the United States. From 1972 until 1976, Hovanec worked as a senior accountant at Arthur Andersen in New York.

23.     **Yatin D. Mody**, age 47, is a resident of Westlake Village, California. Mody began work at Vitesse in 1992 and served as Controller from 1993 through November 1998, at which time he was promoted to Vice President and Controller. Mody's job title changed slightly in 2002 to Vice President, Finance and Controller. In April 2005, he was promoted to Chief Financial Officer and thereafter served as Vice President, Finance and Chief Financial Officer. On May 17, 2006, the Board terminated Mody due to concerns regarding the integrity of

documents evidencing the Company's stock option grant practices.  Mody is a licensed CPA.  He

obtained a California CPA license in November 1990; his license is currently inactive and is set

to expire on March 31, 2011.  Prior to his work at Vitesse, Mody worked as an auditor at

Deloitte & Touche.

24.   **Nicole R. Kaplan**, age 39, is a resident of Agoura Hills, California.  Kaplan

began work at Vitesse in 1998 as Manager of Finance, and in 2004 she became Director of

Finance.  Kaplan obtained a California CPA license in 1996; her license expired in February

2005 and the California Board of Accountancy identifies her license as canceled.  Prior to

working at Vitesse, Kaplan was employed as an auditor with KPMG LLP for approximately four

years.  Kaplan was a member of the audit team with the Auditor that conducted the 1995 and

1996 audits of Vitesse's financial statements.  In the fall of 2005, Kaplan left Vitesse on

maternity leave.  Kaplan officially resigned from Vitesse on April 14, 2006.

## RELATED ENTITY

25.   **Nu Horizons Electronics Corporation ("Nu Horizons")** is a public company

incorporated in Delaware and located in New York.  Nu Horizons and its subsidiaries are

engaged in the distribution of, and provide supply chain services for, high technology electronic

components.  Since mid-2001, Nu Horizons has been, and continues to be, the exclusive North

American distributor for Vitesse products.  During the relevant period, the company's common

stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and

traded on the Nasdaq National Market under the symbol NUHC.

# FACTS

## A.   IMPROPER REVENUE RECOGNITION

26.   Like many semiconductor companies, Vitesse was part of the technology bubble that burst in 2000. Despite reporting over $28 million of net income for fiscal year 2000, Vitesse posted both a loss from operations and a net loss in each fiscal year from 2001 through 2005. The company's losses from operations during this period ranged from approximately $33 million to as much as $167 million. During this time, the amount of revenue Vitesse reported each period became an increasingly important measure of the Company's perceived health. As such, Tomasetta, Hovanec, Mody, and Kaplan orchestrated a multi-year fraudulent scheme to give investors the false impression that Vitesse's revenues were better than they were in reality. From at least September 2001 through April 2006, Tomasetta, Hovanec, Mody and Kaplan engaged in a wide array of fraudulent accounting practices to inflate reported revenue.

### 1.   The Relevant GAAP Revenue Recognition Criteria And Vitesse's Disclosures

27.   Under Generally Accepted Accounting Principles ("GAAP"), revenue is generally recognized when it is realized or realizable and earned. Revenue is considered earned when a company has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. These two conditions, realized and earned, are ordinarily met by the time the product is delivered to customers. When a right of return exists, GAAP requires that certain conditions be met before a company can recognize revenue. The required conditions include that the buyer's obligation to pay the seller is not contingent on resale of the product and that a company be able to reasonably forecast the amount of product returns. GAAP presumes that when the return period is long, a company cannot reasonably forecast product returns, and thus revenue recognition is generally precluded. GAAP also presumes that when the product is

10

susceptible to significant external factors, such as technological obsolescence or changes in demand, a company is unable to forecast product returns, and thus revenue recognition is precluded.

28.    In each of its annual reports filed on Forms 10-K up to and including its 2001 Form 10-K, Vitesse disclosed its revenue recognition policy as a policy where "production revenue is recognized when products are shipped to customers, which is when title and risk of loss transfers to the customer." Beginning in 2002, and continuing through 2005, Vitesse disclosed that its "production revenue is recognized when persuasive evidence of an arrangement exists, the sales price is fixed, products are shipped to customers, which is when title and risk of loss transfers to the customer, and collectability is reasonably assured." This language is similar to the language of *Staff Accounting Bulletin* ("SAB") 101, which Vitesse adopted in the fourth quarter of its 2001 fiscal year.

### 2.    Vitesse Improperly Recognized Revenue upon Shipment Of Product to Nu Horizons from 2001 to 2006

29.    In August of 2001, Tomasetta and Hovanec, among others, engaged in discussions with Nu Horizons concerning the execution of a product distribution agreement between the two companies. After several weeks of negotiations, Vitesse and Nu Horizons executed an Authorized Preferred Distributor Agreement ("Distribution Agreement"). Under the Distribution Agreement, Vitesse was to ship to Nu Horizons certain product for which Vitesse had already identified customer demand. Vitesse actually shipped, however, whatever product it had manufactured without any consideration for Nu Horizons' existing or forecasted demand. Vitesse, moreover, granted Nu Horizons an unfettered right of return on this inventory. From September 2001 through April 2006, Vitesse routinely used its relationship with Nu Horizons to

wrongly record revenue on such shipments and correspondingly failed to reduce revenue and accounts receivable when product was returned.

30.     Vitesse did not disclose in its periodic filings made with the Commission the existence of the Distribution Agreement with Nu Horizons until more than 15 months after the relationship began. In fact, Vitesse did not disclose the distributor relationship with Nu Horizons until December 2002 when it filed its Form 10-K for the fiscal year 2002 with the Commission. The Company's 2002 Form 10-K stated that "certain of the Company's production revenue are made to a major distributor under an agreement allowing for price protection and right of return on products unsold. Accordingly, the Company defers recognition of revenue on such products until the products are sold by the distributor to the end user." This practice was commonly referred to as a "sell-through" model. Similar language appears in each Form 10-K filed by Vitesse with the Commission through December 2005.

31.     In or about September 2001, Vitesse management, including Tomasetta and Hovanec, intentionally withheld information about the Distribution Agreement with Nu Horizons from its Auditor. When Vitesse finally disclosed information about the Distributor Agreement in its 2002 Form 10-K, it did so in the form of a misrepresentation. Vitesse falsely informed investors that it "defers recognition of revenue on such products [shipped to the distributor] until such products are sold by the distributor to the end user."

### a.     The September 2001 Initial Stocking Package

32.     The Distribution Agreement with Nu Horizons contained an undisclosed side letter that included purchase orders and unconditional return rights referred to as the initial stocking package ("ISP"). At the beginning of the agreement in 2001, Hovanec suggested to the President of Nu Horizons that the dollar amount of the ISP be approximately $40 million. The

12

Vitesse side letter explicitly granted Nu Horizons "the right to a one time credit and return for all unsold products against" the ISP. Hovanec knew of the existence of this side letter.

33.     Because Nu Horizons had an unconditional right to return all the product from the ISP, the risk of loss on the ISP inventory never passed from Vitesse to Nu Horizons. In fact, Nu Horizons began returning ISP inventory almost as soon as it was received and continued returning product as many as 18 months after shipment. Notably, in February 2002 alone, Nu Horizons returned nearly $8.2 million of ISP inventory to Vitesse.

34.     On November 18, 2002, approximately 13 and ½ months after Vitesse had already recognized the ISP revenue, Nu Horizons returned more than $2 million of ISP inventory. Tomasetta personally approved Nu Horizons' return of more than $2 million of ISP inventory in November 2002.

35.     At September 30, 2001, Vitesse had already improperly recorded approximately $40 million of revenue from the ISP even though Nu Horizons had sold to end-use customers only $425,000 of ISP inventory. As a result of Vitesse's recognition of the entire ISP as revenue in fiscal year 2001, it had overstated its revenue by approximately $40 million.

36.     The ISP transaction represented 10.4% of Vitesse's 2001 reported revenue of $384 million, and 108% of its reported fourth quarter 2001 revenue of $37 million. The additional revenue provided by the ISP also allowed Vitesse to record $34 million in old unrecorded credits in the fourth quarter of 2001. The fraud related to unrecorded credits is fully alleged in ¶¶ 42-46.

                    b.     **The 2002 through 2006 Quarterly Stocking Packages
                           With Nu Horizons**

37.     Near the end of each quarter, beginning on or about December 2002, Vitesse routinely shipped large amounts of inventory to Nu Horizons. As the close of each quarter

                                        13

approached, Tomasetta and Hovanec directed Vitesse employees to ship product to Nu Horizons in order to close the gap between Tomasetta's internally forecasted revenue target and Vitesse's actual quarterly revenue. During weekly revenue meetings, Tomasetta and Hovanec instructed members of the sales staff to maximize the amount of inventory Vitesse shipped to Nu Horizons. Tomasetta, Hovanec, Mody, Kaplan and others then discussed in smaller, closed-door meetings, specific product shipments to Nu Horizons that would be made in order to close the revenue gap identified by Tomasetta and Hovanec. The defendants sometimes referred to these quarterly shipments as quarterly stocking packages ("QSPs").

38.     At the outset of the QSPs, it was common practice to include a side letter that gave Nu Horizon's an "unfettered right" to return all inventory within six months of the date of the QSP.

39.     Beginning in 2004, Vitesse and Nu Horizons ceased documenting this return arrangement with side letters. Instead, Vitesse and Nu Horizons relied on "handshake" agreements between Hovanec and a Nu Horizons executive. This change corresponded with Hovanec's increased involvement in the negotiation of the QSPs. Beginning at least as early as 2004, Hovanec made quarterly visits to Nu Horizons in order to negotiate the QSPs, which often occurred in New York City. In total, Vitesse entered into QSPs with Nu Horizons for 15 of 16 quarters between March 2002 and March 2006. A summary of the QSPs appears in the following table.

| Month | Vitesse Quarter | Stocking Package Amount | Reported Quarterly Revenue | Stocking Package as % of Reported Revenue | % of Stocking Package Inventory Ultimately Returned to Vitesse |
|-------|-----------------|-------------------------|----------------------------|-------------------------------------------|-----------------------------------------------------------------|
| Mar 2002 | 2Q02 | $  942,464 | $42,089,000 | 2.2% | 0% |
| Mar 2003 | 2Q03 | $  871,645 | $40,172,000 | 2.2% | 0% |

14

| Jun 2003 | 3Q03 | $ 6,608,657 | $39,738,000 | 16.6% | 10% |
| Sept 2003 | 4Q03 | $ 3,578,832 | $38,249,000 | 9.4% | 5% |
| Dec 2003 | 1Q04 | $ 7,613,422 | $50,312,000 | 15.1% | 12% |
| Mar 2004 | 2Q04 | $ 9,176,108 | $56,034,000 | 16.4% | 12% |
| Jun 2004 | 3Q04 | $22,503,570 | $60,417,000 | 37.3% | 45% |
| Sep 2004 | 4Q04 | $21,509,965 | $52,012,000 | 41.4% | 44% |
| Dec 2004 | 1Q05 | $16,958,239 | $44,459,000 | 38.1% | 25% |
| Mar 2005 | 2Q05 | $17,075,076 | $47,158,000 | 36.2% | 10% |
| Jun 2005 | 3Q05 | $16,038,692 | $50,971,000 | 31.5% | 9% |
| Sep 2005 | 4Q05 | $17,021,809 | $48,190,000 | 35.3% | 12% |
| Dec 2005 | 1Q06 | $14,487,474 | $53,011,000 | 27.3% | 8% |
| Mar 2006 | 2Q06 | $21,247,217 | No filing made | ----- | 13% |

40.    The target amount for each QSP was first determined by Hovanec and then discussed with Tomasetta. After that the final dollar amount was communicated to Kaplan who worked on assembling the necessary inventory mix for the QSP to match its dollar amount. Often times, Vitesse, through Hovanec, Kaplan, and top sales managers, pressured Nu Horizons into taking product that it neither wanted nor thought it could sell.

41.    Tomasetta, Hovanec, Mody, and Kaplan knew that immediately recognizing revenue from the ISP and the QSPs violated GAAP because of Nu Horizons' unconditional right to return all of the product contained in the ISP and QSPs to Vitesse.

### 3.    Vitesse's Failure to Record Credits for Returned Product

42.    From 2001 to 2006, Tomasetta, Hovanec, Mody, and Kaplan routinely instructed sales and finance staff to delay recording credits on returned Vitesse product. Both Tomasetta and Hovanec knew that this delay in timely recording credits would cause revenue to be overstated.

43.     Tomasetta instructed the finance staff to take fewer credits each quarter. Both he knew that this practice would result in revenue being inflated. In addition, Tomasetta and Hovanec agreed to "bleed-out" credits over time instead of recording credits in the proper periods. Both Tomasetta and Hovanec knew this violated GAAP.

44.     In order for a customer to return product to Vitesse, the Company had to first issue a Return Merchandise Authorization number ("RMA") to the customer. The customer was instructed to use the RMA when shipping product back to Vitesse; the RMA number was used by Vitesse to identify the corresponding customer credit. Vitesse's finance department needed to keep track of the large quantity of returns, but Tomasetta and Hovanec did not want the returns recorded in the Company's general ledger. Outside the Company's normal accounting system, the finance department maintained an Excel spreadsheet of unrecorded credits organized by RMA. Tomasetta, Hovanec, Mody, and Kaplan knew of the existence of the Excel spreadsheet. The Auditor, however, did not have access to this Excel spreadsheet during its audit field work.

45.     The balance of unrecorded customer credits was discussed during revenue meetings. Tomasetta and Hovanec did not allow any of the finance staff to record credits in the ordinary course of the Company's business. Instead, the recordation of credits was considered an exceptional event that required approval by Tomasetta, Hovanec or Mody. Tomasetta's message during revenue meetings was to always "avoid taking the negative;" in other words, avoid recording credits in the current quarter and instead push the recording of credits off until a later period.

46.     For example, Tomasetta and Hovanec agreed to accept large returns from Nu Horizons on or about September or October 2004. At about that time, Hovanec directed a Vitesse employee to obtain blank RMA forms which later became RMA numbers 10001 and

16

10002. In the first and second quarters of fiscal year 2005, Nu Horizons returned a total of $21.8

million in product to Vitesse. These returns were authorized by Hovanec on out-of-sequence

RMAs numbered 10001, 10002, and 10003. The defendants failed to record these credits in the

periods that Nu Horizons returned the product as summarized below.

| Quarter | RMA 10001 | | RMA 10002 | | RMA 10003 | |
|---|---|---|---|---|---|---|
| | Amount Returned | Amount Credited | Amount Returned | Amount Credited | Amount Returned | Amount Credited |
| 1Q05 | $5,000,000 | $2,940,000 | $7,000,000 | | | |
| 2Q05 | | $668,917 | | $2,013,043 | $11,800,000 | $399,462 |
| 3Q05 | | $1,187,800 | | $732,830 | | |
| 4Q05 | | $12,015 | | $192,701 | | $50,833 |
| 1Q06 | | | | | | $811,417 |
| 2Q06 | | | | $283,640 | | $114,974 |
| 3Q06 | | | | $2,461,256 | | $5,602,435 |
| Total | $5,000,000 | $4,808,732 | $7,000,000 | $5,683,470 | $11,800,000 | $6,979,121 |

After the defendants were either terminated or had resigned by May 2006, Vitesse's new

management directed that all previously unrecorded credits be recorded, including the credits

above in 3Q06. The Company's failure to timely record these credits resulted in a material

overstatement of revenue and accounts receivable in the corresponding periods.

### 4. Vitesse Misapplied Cash Receipts to Hide the Age of Its Invalid Accounts Receivable

47.    As a result of its failure to timely record customer credits, Vitesse's accounts

receivable balances grew and aged. In order for Vitesse to hide its improper revenue recognition

practices related to the ISP and QSPs from its Auditor, Vitesse needed cash to conceal the true

age of its old accounts receivable balances.

48.    In order to conceal the aged balances of Nu Horizons' invalid accounts receivable

from the Auditor during its field work, Hovanec and Kaplan routinely instructed lower-level

finance employees to improperly post cash receipts from other customers to the oldest of Nu

Horizons' accounts receivable. After the Auditor's field work was completed, Kaplan instructed

17

the lower-level finance staff to reverse these entries and apply the cash to the proper customers'
accounts receivable balances. Both Hovanec and Kaplan knew this violated GAAP.

49. This practice of misapplying cash receipts grew dramatically in scale when, in
later periods, Hovanec solicited large cash payments from Nu Horizons at quarter-end. As part
of his quarter-end trips to negotiate the QSPs, Hovanec also requested large cash pre-payments
from Nu Horizons.

50. At times, the cash prepayment solicited by Hovanec was equal to or greater than
the simultaneously negotiated QSP. For example, in Vitesse's second quarter of 2003, Nu
Horizons made a $7 million prepayment to Vitesse at the same time it provided an $871,000
QSP to Nu Horizons. The prepayments from Nu Horizons continued for each of Vitesse's
quarters from March 2003 through March 2006. The prepayments ranged from a low of $2
million to a high of $16 million. The prepayments ranged from 11.8% to 803% of the dollar
amount of the QSPs. The average dollar amount of the quarterly lump sum cash payments was
over $7 million.

51. Upon his return from Nu Horizons, Hovanec, and at times Kaplan, instructed the
lower-level finance staff to post the cash payment to the oldest and largest of Nu Horizons'
outstanding invoices. After completion of the Auditor's field work, the lower-level finance staff
was instructed to reverse the entries.

52. As a result of the numerous discounts, returns, and side deals between Vitesse and
Nu Horizons, the amounts due to Vitesse from Nu Horizons were difficult to reconcile. For
example, on September 15, 2005, at the request of the Auditor, Vitesse sent four letters to Nu
Horizons asking it to confirm that 39 specific invoices listed as outstanding in Vitesse's records
were, in fact, outstanding. The 39 invoices totaled more than $7.6 million and were dated

18

between February 2005 and September 2005. Nu Horizons' records, however, indicated that all 39 invoices were no longer outstanding.

53.     In September or October 2005, Nu Horizons told Kaplan in a phone conversation that it would not confirm these invoices as outstanding because they were indeed not outstanding. At Kaplan's request, however, Nu Horizons agreed not to return the confirmation letters to the Auditor. In its 2005 Form 10-K, Vitesse reported $30.4 million of accounts receivable at September 30, 2005. The $7.6 million of the Nu Horizons invoices represent more than 25% of Vitesse's reported accounts receivable balance.

**B.     THE FRAUDULENT MANIPULATION OF STOCK OPTION GRANT DATES**

## 1.     The Relevant Vitesse Stock Option Plans and Disclosures

54.     Vitesse regularly granted stock options to employees, including officers, under three shareholder approved plans, the 1989 Stock Option Plan, the 1991 Stock Option Plan and the 2001 Stock Incentive Plan (collectively, the "Option Plans"), which were generally effective in consecutive 10 year periods. With the exception of non-statutory options granted under the 2001 and 1989 Plans, these plans required that Vitesse grant all options with exercise prices at no less than 100% of the fair market value of the Company's stock on the "date of grant," which the 1991 and 2001 plans define as "the date on which the Administrator makes the determination granting such Option, or such other later date as is determined by the Administrator." The 1989 Plan provides that the "date of grant" is "the date on which the Board makes the determination granting such Option." For non-statutory options awarded under the 2001 Plan, the plan provided that the exercise price is determined by the plan's Administrator, which was in practice the Compensation Committee of Vitesse's Board of Directors. For non-statutory options

awarded under the 1989 Plan, the plan provided that the exercise price could not be less than 85% of the fair market value of the stock on the date of grant.

55.     Vitesse disclosed in every annual report on Form 10-K for its fiscal years 1996 through 2005 that under the Option Plans the exercise price of all stock options must be at least equal to the fair market value of Vitesse's common stock on the date of grant. Thus, Vitesse consistently disclosed to investors that the Option Plans prohibited the grant of in-the-money options.

56.     Additionally, Vitesse's annual reports on Form 10-K for its fiscal years ended September 30, 2002 through September 30, 2005 affirmatively stated, in substantially similar terms that, other than certain grants made in connection with certain companies Vitesse acquired, all option grants made by Vitesse to employees were granted at the fair market value at the time of grant. Vitesse's quarterly reports on Form 10-Q filed from May 2004 to February 2006 similarly stated that the Company did not grant in-the-money options.

## 2.     Accounting for Employee Stock Options and Vitesse's Disclosures

57.     During the period described herein, GAAP, and in particular Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"), did not require a company to record any compensation expense for employee stock options so long as the option exercise price was set: at the quoted market price of the company's stock on the date of the grant (i.e., an "at-the-money" option), or above the quoted market price of the company's stock on the date of the grant (i.e., an "out-of-the-money" option).

58.     Under APB 25, an employee option granted with an exercise price lower than the quoted market price of the company's stock on the date of grant (i.e., an "in-the-money" option) has "intrinsic value." The "intrinsic value" of a fixed stock option is the difference between the

exercise price and the quoted market price of the company's stock on the date of grant or the "measurement date." During the period described herein, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." The measurement date, as defined by APB 25, is the first date on which the following information is known: (i) the number of options that an individual is entitled to receive, and (ii) the exercise price. Under APB 25, the intrinsic value of a fixed stock option must be recognized over the vesting period of the option. Options that are at-the-money or out-of-the-money on their grant or measurement date have no intrinsic value and therefore need not be expensed.

59.     Beginning on December 15, 1998 and continuing through the period described herein, FASB Interpretation No. 44, *Accounting for Certain Transactions Involving Stock Compensation, an Interpretation of APB Opinion No. 25* ("FIN 44"), required the application of variable accounting under APB 25 when an employee's stock option is repriced unless a six-month waiting period requirement is met. Variable accounting requires that compensation expenses be adjusted from period to period, based on variations in the market price of the company's stock as compared to the exercise price of the option grant.

60.     Vitesse's Forms 10-K for fiscal years ended September 30, 1996 through September 30, 2005 stated that the Company prepared its financial statements in accordance with GAAP, and that Vitesse accounted for stock option grants in accordance with APB 25. Vitesse also disclosed in its Forms 10-K for fiscal years 2000 through 2005 that it complied with FIN 44. Vitesse's Forms 10-Q filed from May 2003 to February 2006 also state that the Company applied, or accounted for stock option grants in accordance with, APB 25.

3.    **The Stock Option Granting Process at Vitesse**

61.    Vitesse regularly granted options to employees and officers at the time they were hired and on an annual ("evergreen") basis. Vitesse periodically granted other types of options as well, such as performance and retention awards. Vitesse's Compensation Committee comprised of independent directors approved all option grants that Vitesse awarded. The Committee typically granted options at in-person meetings following regularly scheduled Board meetings, and at times granted options during telephonic meetings or by unanimous written consent.

62.    Tomasetta approved all grant proposals before he recommended them to the Compensation Committee. After Tomasetta approved the proposed recipients and number of options, Tomasetta, Hovanec and Mody's administrative assistant -- who also served as the Company's de facto stock option administrator ( the "Assistant") -- typically provided a schedule of these options to the Compensation Committee in advance of the Committee's meetings. Schedules provided to the Committee generally did not include a recommend date or exercise price, though proposals for new hires at times identified the employees start date as the intended grant date.

63.    Tomasetta and Hovanec attended Compensation Committee meetings and presented the option proposals to the Committee, and the Committee typically considered and approved grants in their presence without modification. Vitesse's Compensation Committee did not discuss option exercise prices. Compensation Committee members intended and believed that, with the exception of new hire grants, the grant dates for all options they approved were the dates of the meetings where they approved the options, and that the exercise price of the options would be the close of Vitesse's stock on the approval dates. For new hires, Compensation

Committee members believed that the exercise price was set at the closing price of the Company's stock on either the date of the Committee's approval or the employee's start date.

64.    Sometime after the Committee approved a set of grants, the Assistant entered the options into the Company's electronic stock options database (Equity Edge) based on the approved option grant schedule (which included optionee names and option numbers), and a grant date and exercise price provided by Tomasetta or Hovanec. These lists at times included options and recipients that Tomasetta had authorized but that the Committee had not previously granted. The Assistant then printed a "Notice of Stock Options and Option Agreement" ("Grant Notices") for each individual grant, and asked Hovanec or Tomasetta to sign them on behalf of Vitesse. After the Grant Notices were signed, the Assistant forwarded them to Company supervisors to distribute to employees.

### 4.    The Stock Option Backdating Scheme

65.    Between 1995 and 2005, Tomasetta and Hovanec regularly disregarded the dates the Compensation Committee approved stock option grants and routinely used hindsight to select grant dates based on low points in the price of Vitesse's stock. At times, Tomasetta and Hovanec sought the Assistant's support in identifying low prices, such as by directing the Assistant to print a list or chart of Vitesse's stock prices covering a one to three month period. Tomasetta or Hovanec would then choose a low price or ask the Assistant to identify the low price.

66.    Selection of favorable exercise prices occurred at different times relative to the Compensation Committee's approval of the grant. In some cases, Tomasetta and/or Hovanec chose a favorable price by looking back days, weeks or months at or around the date of the Committee's approval. At other times, they waited to see if the stock price would decline further

23

after the Committee's approval before retroactively selecting the price. In still other instances, when Vitesse's stock price continued to decline in the weeks or months after Tomasetta and/or Hovanec had selected a price, they used hindsight to regrant or "reprice" the options. Certain options were repriced multiple times, with Tomasetta and/or Hovanec using hindsight to select each new price.

67.     Through the backdating, Tomasetta and Hovanec caused Vitesse to falsify its books and records to reflect the chosen date as the purported grant date instead of the date the options were actually approved by the Compensation Committee. After Tomasetta and/or Hovanec chose a low price for the options, they instructed the Assistant to record the price and corresponding "grant date" in Equity Edge. In connection with some of the grants that Tomasetta and/or Hovanec repriced, Tomasetta and/or Hovanec at times instructed the Assistant to delete the original grant date entries from Equity Edge and to shred all documents associated with the original grants. They also instructed the Assistant to record the selected price and "grant date" in the Compensation Committee meeting minutes that the Assistant prepared from Hovanec's handwritten notes. Hovanec signed the final version of the Compensation Committee minutes as Secretary for each meeting.

68.     For approximately fifteen of the backdated options, the Committee minutes are backdated or misdated on their face, meaning that the correct meeting date is included in the title and first paragraph, but later in the text or on the attached schedules the minutes disclose the false grant date that Tomasetta and/or Hovanec had selected. In addition, the Grant Notices given to employees reflect the chosen date and price as the grant date and exercise price for the options.

69.     As a result of Tomasetta and Hovanec's actions, Vitesse backdated the grant dates

for at least 40 option grants during 1995 through 2005. Nearly every annual evergreen grant to

the Company's employees and officers was backdated. Grants to new hires were backdated, on

occasion, to dates before Vitesse had even hired the employee. One-off grants to employees

were also backdated. In total, and as set forth in the charts below, Vitesse backdated or repriced

a total of 6,953 individual option grants with 43 fraudulent grant dates covering approximately

49 million options.

70.     In the charts below, the "Revised Grant Date" represents the revised measurement

date that Vitesse recorded in its Stock Options Restatement.

**Backdated Evergreen Grants**

| Purported Grant Date | Revised Grant Date | Exercise Price | Exercise Price on Revised Grant Date | Difference in Share Price | Total Shares Granted |
|---|---|---|---|---|---|
| 1/27/1995 | 4/19/1995 | $4.50 | $4.56 | $0.06 | 400,500 |
| 1/23/1996 | 9/17/1996 | $11.25 | $41.12 | $29.87 | 275,000 |
| 3/19/1997 | 4/15/1997 | $22.50 | $30.50 | $8.00 | 913,700 |
| 1/1/1998 | 4/21/1998 | $37.75 | $56.63 | $18.88 | 1,280,600 |
| 10/5/1998 | 1/26/1999 | $18.06 | $48.75 | $30.69 | 2,112,050 |
| 4/6/2001 | 7/12/2001 | $17.44 | $18.85 | $1.41 | 5,668,900 |
| 10/2/2001 | 1/29/2002 | $7.27 | $12.46 | $5.19 | 6,952,450 |
| 12/17/2003 | 4/17/2004 | $5.69 | $5.77 | $0.08 | 4,204,500 |
| 10/20/2003 | 10/16/03; repriced on 1/26/2004 | $6.97 | $7.32 repriced $8.74 | $0.35 $1.77 | 1,600,000 |
| 10/27/2004 | 1/24/2005 | $2.58 | $3.18 | $0.60 | 10,821,100 |
| **Total** | | | | | 34,228,800 |

**Backdated New Hire Grants**

| Purported Grant Date | Revised Grant Date | Exercise Price | Exercise Price on Revised Grant Date | Difference in Share Price | Total Shares Granted |
|---|---|---|---|---|---|
| 2/24/1997 | 4/15/1997 | $28.91 | $30.50 | $1.59 | 96,750 |
| 3/31/1997 | 4/15/1997 | $27.62 | $30.50 | $2.88 | 12,500 |
| 4/21/1997 | 7/19/1997 | $27.75 | $41.00 | $13.25 | 4,000 |

| | | | | | |
|---|---|---|---|---|---|
| 10/5/1998 | 10/17/1998 | $18.06 | $28.44 | $10.38 | 18,500 |
| 10/1/1998 | | $20.44 | $48.75 | $28.31 | 12,500 |
| 11/2/1998 | 1/26/1999 | $33.00 | $48.75 | $15.75 | 111,000 |
| 12/1/1998 | | $35.75 | $48.75 | $13.00 | 11,000 |
| 1/4/1999 | | $44.31 | $48.75 | $4.44 | 135,500 |
| 4/24/2000 | 4/18/2000 repriced on 7/18/2000 | $50.63 | $62.56 repriced $73.56 | $11.93 $22.93 | 125,200 |
| 4/24/2000 | 7/18/2000 | $50.63 | $73.56 | $22.93 | 28,200 |
| 5/10/2000 | 7/18/2000 | $45.75 | $73.56 | $27.81 | 74,100 |
| | 9/21/2000 | | $86.00 | $40.25 | 10,000 |
| 5/23/2000 | 7/18/2000 | $41.38 | $73.56 | $32.18 | 25,000 |
| 6/1/2000 | 7/18/2000 | $56.50 | $73.56 | $17.06 | 28,300 |
| | 9/21/2000 | | $86.00 | $29.50 | 300,000 |
| 6/30/2000 | 7/18/2000 | $73.56 | $73.56 | $0.00 | 61,500 |
| 7/5/2000 | 7/18/2000 | $69.25 | $73.56 | $4.31 | 27,700 |
| | 9/21/2000 | | $86.00 | $16.75 | 3,100 |
| 7/28/2000 | 9/21/2000 | $56.56 | $86.00 | $29.44 | 300 |
| 7/5/2000 | | $69.25 | $86.00 | $16.75 | 100 |
| 7/28/2000 | | $56.56 | $86.00 | $29.44 | 21,100 |
| 8/3/2000 | 9/21/2000 | $54.81 | $86.00 | $31.19 | 152,400 |
| 8/16/2000 | | $77.94 | $86.00 | $8.06 | 25,600 |
| 9/12/2000 | | $78.75 | $86.00 | $7.25 | 43,600 |
| 9/18/2000 | | $80.19 | $86.00 | $5.81 | 14,000 |
| 2/13/2001 | 7/12/2001 | $20.00 | $18.85 | ($1.15) | 39,088 |
| 4/6/2001 | 1/23/2001 repriced on 4/12/2001 | $17.44 | $75.88 repriced $25.70 | $58.44 $8.26 | 134,200 |
| 4/6/2001 | 4/12/2001 | $17.44 | $25.70 | $8.26 | 560,150 |
| 7/10/2001 | 7/12/2001 | $15.78 | $18.85 | $3.07 | 589,700 |
| 10/2/2001 | 9/20/2001 repriced on 10/25/2001 | $7.27 | $8.92 repriced $11.35 | $1.65 $4.08 | 311,700 |
| | 10/25/2001 | $7.27 | $11.35 | $4.08 | 183,300 |
| 10/30/2001 | 1/29/2002 | $8.84 | $12.46 | $3.62 | 2,000 |
| 11/2/2001 | 1/29/2002 | $9.98 | $12.46 | $2.48 | 90,900 |
| 12/3/2001 | 1/29/2002 | $11.11 | $12.46 | $1.35 | 168,400 |
| 1/23/2002 | 1/29/2002 | $11.62 | $12.46 | $0.84 | 93,900 |
| | 4/18/2002 | $11.62 | $7.94 | ($3.68) | 38,200 |
| 5/6/2002 | 4/18/2002 repriced on 7/18/2002 | $4.62 | $7.94 repriced $3.18 | $3.32 ($1.44) | 219,500 |
| 8/15/2002 | 7/18/2002 repriced on 9/19/2002 | $1.26 | $3.18 repriced $0.99 | $1.92 ($0.27) | 178,800 |
| **Total** | | | | | 3,951,788 |

**Backdated Other Grants**

| Purported Grant Date | Revised Grant Date | Exercise Price | Exercise Price on Revised Grant Date | Difference in Share Price | Total Shares Granted |
|---|---|---|---|---|---|
| 9/13/1995 | 9/14/1995 | $10.75 | $11.25 | $0.50 | 75,000 |
| 3/19/1997 | 4/15/1997 | $22.50 | $30.50 | $8.00 | 136,500 |
| 1/1/1998 | 4/21/1998 | $37.75 | $56.62 | $18.87 | 2,000 |
| 5/14/1998 | 7/14/1998 | $26.75 | $33.75 | $7.00 | 6,000 |
| 10/5/1998 | 1/26/1999 | $18.06 | $48.75 | $30.69 | 40,000 |
| 1/1/1999 | 7/20/1999 | $45.63 | $59.25 | $13.62 | 1,000 |
| 5/24/1999 | | $52.63 | $59.25 | $6.62 | 139,000 |
| 1/26/2000 | 4/18/2000 | $46.63 | $62.56 | $15.93 | 19,100 |
| 4/24/2000 | 7/18/2000 | $50.63 | $73.56 | $22.93 | 34,000 |
| 9/18/2000 | 9/21/2000 | $80.19 | $86.00 | $5.81 | 1,500 |
| 4/6/2001 | 7/12/2001 | $17.44 | $18.85 | $1.41 | 1,273,644 |
| 7/10/2001 | 7/12/2001 | $15.78 | $18.85 | $3.07 | 609,591 |
| 10/2/2001 | 10/25/2001 | $7.27 | $11.35 | $4.08 | 230,876 |
| | 1/29/2002 | $7.27 | $12.46 | $5.19 | 7,438,741 |
| | 4/18/2002 | $7.27 | $7.94 | $0.67 | 195,000 |
| 10/30/2001 | 1/29/2002 | $8.84 | $12.46 | $3.62 | 2,950 |
| 11/2/2001 | 1/29/2002 | $9.98 | $12.46 | $2.48 | 5,350 |
| 12/3/2001 | 1/29/2002 | $11.11 | $12.46 | $1.35 | 3,500 |
| 1/23/2002 | 1/29/2002 | $11.62 | $12.46 | $0.84 | 6,350 |
| 4/22/2002 | 4/18/2002 repriced on 7/18/2002 | $7.36 | $7.94 repriced $3.18 | $0.58 ($4.18) | 125 |
| 5/6/2002 | 4/18/2002 repriced on 7/18/2002 | $4.62 | $7.94 repriced $3.18 | $3.32 ($1.44) | 24,400 |
| 8/15/2002 | 7/18/2002 repriced on 9/19/2002 | $1.26 | $3.18 repriced $0.99 | $1.92 ($0.27) | 7,475 |
| 4/1/2003 | 4/17/2003 | $2.18 | $2.40 | $0.22 | 15,000 |
| 12/17/2003 | 4/17/2004 | $5.69 | $5.77 | $0.08 | 72,500 |

| 10/27/2004 | 1/24/2005 | $2.58 | $3.18 | $0.60 | 226,000 |
|---|---|---|---|---|---|
| Total | | | | | 10,565,602 |

71.    Vitesse, through the knowing or reckless actions of Tomasetta and Hovanec,

failed to record compensation expense for any of these options in the financial statements it filed

with the Commission in annual, quarterly, and other reports during the fiscal years ended

September 30, 1996 through the first quarter of 2006, which ended December 31, 2005.  These

unrecorded expenses, which are contained within the Stock Options Restatement included in

Vitesse's Form 10-K filed in September 2008, overstated Vitesse's annual pretax income or

understated it annual pretax loss by between approximately 1.7% and 45.7% during the fiscal

years 1996 to 2005, as identified in the chart below.

| Fiscal Year | Approximate Unrecorded Stock Comp Expense | Previously Reported Pretax Income (Loss) | Approximate Unrecorded Stock Comp as % of Pretax Results |
|---|---|---|---|
| 1996 | $      233,791 | $  14,050,000 | 1.7 % |
| 1997 | $   4,708,512 | $  36,540,000 | 12.9 % |
| 1998 | $   7,349,285 | $  65,951,000 | 11.1 % |
| 1999 | $ 23,393,202 | $103,890,000 | 22.5 % |
| 2000 | $ 22,489,536 | $  81,678,000 | 27.5 % |
| 2001 | $ 28,723,399 | ($159,062,000) | 18.1 % |
| 2002 | $ 46,047,137 | ($823,719,000) | 5.6 % |
| 2003 | $ 24,625,010 | ($131,179,000) | 18.8 % |
| 2004 | $ 15,362,456 | ($  33,613,000) | 45.7 % |
| 2005 | $ 11,293,558 | ($126,811,000) | 8.9 % |
| Total | $184,225,887 | -- | -- |

## 5.    Tomasetta and Hovanec Knew or Recklessly Disregarded The Pricing Requirements of the Option Plans and the Applicable Stock Option Accounting Rules

72.    Tomasetta and Hovanec knew or were reckless in not knowing that Vitesse's

shareholder-approved Option Plans prevented in-the-money grants for most options during the

period from 1995 to 2005.  Tomasetta reviewed, signed, and in certain years certified Vitesse's

fiscal 1996 - 2005 Forms 10-K, and Hovanec reviewed, signed, and in certain years certified Vitesse's 1996 – 2004 Forms 10-K, containing the above identified disclosures that the Option Plans prohibited the grant of in-the-money options and/or that all option grants made by Vitesse to employees were granted at the fair market value at the time of grant. Tomasetta also reviewed and certified the above identified Forms 10-Q filed from May 2004 to February 2006 that stated Vitesse did not grant in-the-money options, and Hovanec reviewed, signed, and certified the Forms 10-Q filed from May 2004 to February 2005.

73.     In addition, during their attempt to cover-up certain of their stock option backdating misconduct during late 2005 to April 2006 following media inquiries of possible backdating at the Company (discussed below in ¶¶ 112-118), they told Vitesse directors in early 2006 that the Company historically priced options at the market value of the stock on the date the Compensation Committee approved the grants.

74.     Tomasetta and Hovanec also knew or recklessly disregarded the accounting rules governing in-the-money and repriced option grants. Both of them reviewed, signed, and in certain years certified the above identified Forms 10-K that stated Vitesse prepared its financial statements in accordance with GAAP and accounted for stock option grants in accordance with APB 25 and FIN 44. They also reviewed, signed, and certified various Vitesse Forms 10-Q filed from May 2003 through fiscal 2005 that contain similar disclosures. Further, they reviewed and signed various management representation letters provided to the Company's Auditor (identified below in ¶¶ 156-158) that stated that stock option grants were accounted for in accordance with APB 25.

75. Hovanec, as a Certified Public Accountant, was trained in accounting, worked as an auditor for five years (1972 to 1976) at Arthur Andersen rising to the level of senior accountant, and served in various accounting positions at other public companies.

76. Tomasetta and Hovanec knew the accounting ramifications of granting in-the-money options at least as early as April 1999. In mid-1999 Vitesse acquired a software company called XaQti. To induce XaQti to agree to the acquisition, Tomasetta and Hovanec agreed to grant in-the-money options to certain XaQti employees after they joined Vitesse. In connection with these grants, Mody explained to Tomasetta and Hovanec that when the exercise price of an option is less than the fair market value of the underlying stock on the date of grant, a registrant must expense the difference between the exercise price and the grant date fair market value. Mody informed Tomasetta and Hovanec that Vitesse would have to expense the in-the-money portion of the options (approximately $5 million) over the life of the options, as long as the employees remained with Vitesse. Consistent with Mody's statements, Vitesse recorded compensation expense for these options in its Forms 10-K for the fiscal years 2000 through 2002, which Tomasetta and Hovanec reviewed and signed.

77. In addition, in late 2005 during Tomasetta's and Hovanec's attempt to cover-up certain of their backdating, the law firm that served as Vitesse's long-time outside counsel ("Outside Counsel") reminded Tomasetta and Hovanec about the accounting ramifications of granting in-the-money options. In this same period, Mody also represented to the Audit Committee of Vitesse's Board of Directors and Vitesse's Auditor, at an Audit Committee meeting which Tomasetta and Hovanec attended, that Vitesse had properly accounted for prior option grants in accordance with APB 25. Days later, Vitesse filed its 2005 10-K that Tomasetta

reviewed, signed, and certified, but which failed to record compensation expenses generated by Tomasetta and Hovanec's backdating.

78.    By at least July 2002, Tomasetta and Hovanec also knew of the accounting and disclosure requirements for repriced options. Around this time underwater options were depressing morale at Vitesse and the Company sought advice from its Outside Counsel about how to reestablish the value of these options. Outside Counsel advised Vitesse management, including through slides sent to Hovanec that Outside Counsel prepared for a Board presentation, and via conference calls with Hovanec, that if Vitesse repriced existing options then the revised options would be subject to variable accounting. Reissuing new options six months and one day after the originals had been canceled, however, would not require such accounting. Outside Counsel further explained that shareholders disfavor repricings because they incur real losses when the price of their own stock declines but receive no special treatment, and further that repriced grants to named executives in the Company's proxy statements must be disclosed.

79.    This information was communicated to Tomasetta and both he and Hovanec explained to Vitesse's board of directors the consequences of repricing or canceling options. Also, at a July 18, 2002 Compensation Committee meeting that Outside Counsel participated in by phone, Tomasetta discussed with the Committee two different proposals for dealing with underwater options. Vitesse ultimately disclosed in its 2002 proxy statement that the Committee had declined to cancel underwater options previously granted to Tomasetta and other executives, and reissue new ones, because the new options would be subject to variable accounting. This decision was made jointly with Tomasetta and Hovanec.

31

5.    **Examples of Tomasetta's and Hovanec's Options Backdating**

    a.    **July 10, 2001 New Hire and Other Grants**

80.    Vitesse's July 10, 2001 grant of 1,199,291 options to 141 new hires and certain current employees was backdated by two days. On July 12, 2001, Tomasetta and Hovanec attended a Compensation Committee meeting where the Committee approved the options. The stock closed that day at $18.85. On or about this date, Hovanec looked back to select a low price for the options. A stock price chart from the Assistant's files dated July 11, 2001 lists Vitesse's stock price from June 15 to July 11. The price next to the July 10 date, which is the lowest price on the chart, is circled and next to it Hovanec wrote, "[Assistant] stock price Gene." The Compensation Committee meeting minutes documenting this grant are backdated, stating that the exercise price shall be 100% of the fair market value of the stock on July 10, 2001.

81.    Based on the closing price of Vitesse's stock on July 10 ($15.78), these options were in-the-money on a per share basis by $3.07, and in the aggregate by approximately $3.7 million. Hovanec signed the meeting minutes documenting the grant, and towards the end of July through September, both he and Tomasetta signed the corresponding Grant Notices which contained the false grant date. In its Stock Options Restatement, Vitesse revised the measurement date for these options to July 12, 2001.

    b.    **May 6, 2002 New Hire and Other Options**

82.    Vitesse's May 6, 2002 grant of 244,025 options to 50 new hires and certain current employees was backdated and then repriced as Vitesse's stock price declined. On April 18, 2002, Tomasetta and Hovanec attended a Compensation Committee meeting where the Committee granted the options. In the following weeks, Tomasetta and Hovanec twice manipulated the grant date for these options

83.   Hovanec first selected April 22, 2002 as the grant date. On a stock price chart listing Vitesse's stock prices from January 30 to April 18, the Assistant wrote, "Gene, Hire dates (highlighted) for new grants. Last qtr we used the low in each month. [Assistant]". Hovanec responded by writing on the chart, "do them as of today Gene 4/22/02 hire date vest", meaning that the Assistant should record April 22 as the grant date but use the employees' hire date to commence the options' vesting period. The closing price of Vitesse's stock on April 22 was the second to lowest closing price of the Company's stock between January 30 and April 22.

84.   Hovanec and Tomasetta thereafter selected a new grant date with a lower price. In an email chain between the Assistant and a vice president in Vitesse's European operations, dated between May 8 and May 10, 2002, the Assistant stated:

> The whole group of new hire grants approved at the April 18 Board of Directors meeting were given a grant date of April 22, option price $7.36. Then, when the stock price began to fall, Gene Hovanec suggested I wait a week or two before we finalized everything to send to employees. We talked about it again yesterday and decided to discuss with Lou on Friday (he's traveling Wed & Thur) to make sure we are going to go ahead with the April 22 grant date & price.

85.   Tomasetta ultimately instructed the Assistant to change the grant date from April 22 to May 6. On a stock price chart listing Vitesse's stock price from April 18 to May 8, 2002, the Assistant wrote, "New hires Feb, March, April change to," followed by an arrow pointing to the date 5/6/02 and the price $4.62. This date and price are circled, and the Assistant wrote, "per Lou on 5-10-02(.)" The closing price of Vitesse's stock on May 6 was the lowest closing price of the Company's stock between January 30 and May 10. Based on the closing price on May 6, the exercise price for these options was $3.32 per share ($809,748 in the aggregate) lower than the closing price of Vitesse's stock on April 18, when the options were actually approved.

86.     On or about May 13, 2002, Hovanec signed the Grant Notices for these grants which contained the false May 6 grant date.

87.     The minutes documenting the Compensation Committee's April 18 meeting are backdated and state that the exercise price for the options shall be 100% of the fair market value of the stock on May 6.  Hovanec signed the minutes.

88.     In its Stock Options Restatement, Vitesse concluded that these options were first granted on April 18, 2002 and then repriced on July 18, 2002, the date of the next board meeting when the Compensation Committee minutes were final and signed.  As a result of the repricing, Vitesse applied variable accounting to the options, recording approximately $89,869 in compensation expense.

       **c.**    **October 2, 2001 Fiscal 2002 Officer/Employee Evergreen Options**

89.     Tomasetta and Hovanec manipulated Vitesse's October 2, 2001 grant of approximately 6.9 million evergreen options to 1,057 employees and various officers on three separate occasions, backdating the final grant by approximately four months.  In the first instance, it appears that at the July 12, 2001 Compensation Committee meeting, which Tomasetta and Hovanec attended, the Committee considered a preliminary total evergreen option number.  At that meeting the Committee was not provided with any option grant schedules containing specific proposals for identified employees, and it did not approve the fiscal year 2002 evergreens at that time.  The Assistant's handwritten notes on a summary sheet of grants to be considered at the meeting state "grant date TBD" for the employee evergreens and certain other options, and the minutes of the July 12 meeting make no mention of the evergreens.  Nevertheless, at Tomasetta's or Hovanec's direction, and using the same July 10, 2001 backdated grant date that Hovanec had selected for the new hire and other options that were