actually granted at this meeting (discussed above), the Assistant recorded a grant date and exercise price of July 10, 2001 and $15.78 in various Company records for these evergreen options.

90. As the Company's stock price declined, Tomasetta and/or Hovanec instructed the Assistant to change the grant date to August 21, 2001 and a price of $13.23. The Assistant typed draft minutes of a purported August 21 telephonic meeting of the Compensation Committee where the Committee allegedly granted the evergreens. In fact, no such meeting occurred, and these minutes were never signed. The Assistant ultimately deleted the August 21 date and the corresponding price from Equity Edge at Tomasetta's and/or Hovanec's direction.

91. Tomasetta and/or Hovanec instructed the Assistant to change the grant date and exercise price for the options for a third and final time to October 2, 2001 and $7.27. This grant is identified in minutes of a meeting of the Compensation Committee held on October 25, 2001, which Tomasetta and Hovanec attended. The minutes are backdated and state that the exercise price of the options shall be 100% of the fair market value of the stock on October 2, 2001. Vitesse's Compensation Committee, however, did not meet on October 2, 2001 or otherwise take any actions to grant the options on this date.

92. The October 2 "grant" was not finalized until four months after the purported grant date, as evidenced by various documents and Tomasetta and Hovanec's approval. The Assistant included a draft of the October 25 Committee minutes in the board book for the next board meeting, which occurred on January 29, 2002; the draft contains total evergreen options that differ slightly from the final version of the minutes that Hovanec signed on or after that date. In a January 30, 2002 inter-office memo, the vice president of Vitesse's Human Resources department ("HR Department") distributed "this year's final approved evergreen stock option

35

list" to various supervisors noting the October 2 "grant date" and price, and informing them that they "can now advise your employees" of the grant and that the Assistant will distribute the option paperwork in the next 60 days. A chart the Assistant prepared after the January 29 Compensation Committee meeting identifies the type, vesting periods, and backdated grant dates for both options the Committee approved on January 29 as well as for the fiscal year 2002 evergreen and certain other options. For the evergreen and certain other options the chart states, "Grant date is 10/2/01." The Assistant wrote on the chart, "OK'd by Lou & Gene 2-11-02." Finally, in March 2002 Hovanec and Tomasetta signed the Grant Notices for the evergreen options which the Assistant then distributed to employees.

93. The closing price of Vitesse's stock on October 2 was the second to lowest closing price of the Company's stock between July 2001 and January 29, 2002; Vitesse's stock closed just $0.24 lower on September 27.

94. In its Stock Options Restatement, Vitesse revised the measurement date for these options to January 29, 2002. Based on the closing price of the stock on this date ($12.46), the options were in-the-money by $5.19 per share, or approximately $36 million in the aggregate. Tomasetta's 1.2 million options were in-the-money by approximately $6.2 million and Hovanec's 300,000 options were in-the-money by $1.5 million.

95. In addition, as alleged below, during November 2005 – April 2006, faced with media inquiries concerning possible backdating at Vitesse, Tomasetta and Hovanec attempted to cover up the fact that they had backdated the fiscal year 2002 evergreen grants. Tomasetta and Hovanec fabricated board of director minutes that falsely documented a telephonic meeting of the Compensation Committee on October 2, 2001, which never occurred. Tomasetta also inserted an entry for an October 2, 2001 meeting into his Palm Pilot.

### d.     March 19, 1997 Fiscal 1997 Officer/Employee Evergreen Options

96.     Tomasetta and/or Hovanec backdated Vitesse's fiscal year 1997 officer and employee evergreen grant from April 15, 1997 to March 19, 1997. This grant included approximately 913,700 options awarded to 216 employees and officers.

97.     Tomasetta and Hovanec attended a meeting of Vitesse's Compensation Committee on April 15, 1997 at which time the Committee approved a nearly final list for the fiscal year 1997 evergreen options for officers and employees. The board book for Vitesse's next quarterly board meeting, which occurred on July 15, 1997, which Tomasetta and Hovanec also attended, includes an unsigned draft of the April 15, 1997 Compensation Committee meeting minutes. This draft states that on April 15th, "Dr. Tomasetta reviewed the process used to determine additional stock option awards to current employees based on current performance and long-term contribution to the Corporation." The draft further states that the Committee approved the employee and officer evergreens on April 15th, and that in accordance with the terms of the company's option plans, the exercise price for these options is "the closing price of the company's stock on the date of the Compensation Committee meeting."

98.     The signed version of the April 15, 1997 Compensation Committee meeting minutes, however, discloses an exercise price that is different from the exercise price disclosed in the unsigned version of the minutes included in the July 15th Board book. These signed minutes state that the exercise price for the options granted at the meeting is the closing price of the company's stock on "the date of the telephonic meeting of the Compensation Committee, March 19, 1997." Vitesse's Compensation Committee, however, did not approve the fiscal year 1997 evergreen options at a telephonic meeting on March 19, 1997.

37

99.  Moreover, Vitesse's Compensation Committee did not even approve the final version of the officer evergreens until after April 15, 1997. On April 22, 1997, Tomasetta submitted a final proposal for the officer evergreens to the then Chair of the Compensation Committee. In that proposal, Tomasetta noted that one of the other directors suggested increasing Tomasetta's evergreen grant by an additional 50,000 options.

100.  The closing price of Vitesse's stock on March 19, 1997 was $22.50, which was the lowest closing price of the Company's stock during all of 1997. In its Stock Options Restatement, Vitesse revised the measurement date for these evergreen options to April 15, 1997. Based on the closing price of Vitesse's stock on this date ($30.50), these options were in-the-money on a per share basis by $8, and in the aggregate by approximately $7,309,600. Tomasetta's 600,0000 options (split-adjusted) were in-the-money by approximately $1.2 million, and Hovanec's 120,000 options (split-adjusted) were in-the-money by approximately $240,000.

101.  Hovanec signed the April 15, 1997 Compensation Committee meeting minutes, Tomasetta signed Hovanec's corresponding stock option Grant Notice, and Hovanec signed the remaining stock option Grant Notices to employees and officers.

  e.  **August 15, 2002 New Hire and Other Grants**

102.  On July 18, 2002, Tomasetta and Hovanec attended a Compensation Committee meeting where the Committee granted 178,800 options to 48 new hires and certain current employees. Vitesse's stock price declined thereafter, and on August 20, 2002, Hovanec repriced these options and gave them a revised grant date of August 15, 2002. A copy of the option grant schedule that management submitted to the Compensation Committee at the July 18 meeting contains handwritten notations that state "$2.42" and "grant as of July 31, 2002." The July 31 date is crossed out and on top of this date there is another handwritten date of "8-15-02." The

handwritten phrase thus reads "grant as of 8-15-02." This notation is signed by Hovanec and there is another handwritten notation stating "(revised 8-20-02 by Gene.)"

103.  The closing price of Vitesse's stock on August 15, 2002 was $1.26. This price represents the second to lowest closing price of the Company's stock between July 18th and August 20, 2002. (Vitesse's stock closed just $0.01 lower on August 12, 2002.)

104.  On or about August 23 2002, Hovanec signed the Grant Notices for these grants which contained the false August 15, 2002 grant date. The minutes documenting the Compensation Committee's July 18, 2002 meeting are backdated and state that the exercise price for these options is 100% of the fair market value of the company's stock on August 15, 2002. Hovanec signed the minutes.

105.  In its Stock Options Restatement, Vitesse concluded that these options were first granted on July 18, 2002, and then repriced on September 19, 2002, the date of the next board meeting when the Compensation Committee minutes were final and signed. As a result of the repricing, Vitesse applied variable accounting to the options, recording approximately $455,825 in compensation expense in 2003, and reversing approximately $207,335 of this expense in 2004 and $35,346 of this expense in 2005 to give effect to subsequent declines in Vitesse's stock price.

   f. **December 17, 2003 Employee Evergreen and Outstanding Performer Grants**

106.  Tomasetta and or Hovanec backdated Vitesse's fiscal year 2004 employee evergreen and outstanding performer option grants from April 17, 2004 to December 17, 2003. This grant included approximately 4,277,000 options that went to approximately 655 employees.

107.  Tomasetta and Hovanec attended a meeting of Vitesse's Compensation Committee on October 16th, 2003 at which time the Committee reviewed preliminary proposals

39

for outstanding performer and officer and employee evergreen grants. Eight days later, Vitesse's HR Department forwarded preliminary employee evergreen option proposals to Company managers (including Tomasetta and Hovanec) requesting that they review, edit, and return the revised proposals by November 21st so that Tomasetta could approve the grants. Vitesse's managers were still submitting revisions to the HR Department through the end of January 2004. On December 22, 2003, an employee in the HR Department sent an email to a Vitesse vice president stating that the grant date and exercise price for the evergreen and outstanding performer grants had not yet been determined.

108.  After Tomasetta approved the revised employee evergreen proposals, the Assistant included schedules for the evergreens, as well as for proposals for outstanding performer grants, in the board book that the Assistant prepared for the Board's next meeting on January 26, 2004. At that meeting, which Tomasetta and Hovanec attended, Vitesse's Compensation Committee reviewed and granted the option proposals that were presented. On February 5, 2004, an employee in the HR Department sent an email to Vitesse managers (including Tomasetta and Hovanec) informing them that Tomasetta had approved the outstanding performer grants with a grant date of December 17, 2003.

109.  Vitesse's January 26, 2004 Compensation Committee meeting minutes are backdated. They state that the Committee granted the employee evergreens and outstanding performer options on January 26th, and then they further state that the exercise price for the options is the fair market value of Vitesse's stock "on the date of grant, December 17, 2003." The closing price of Vitesse's stock on December 17th was $5.69. This price is the lowest closing price of the Company's stock between September 2003 and March 2004.

110. As alleged below, during November 2005 through April 2006, faced with media inquiries concerning possible backdating at Vitesse, Tomasetta and Hovanec attempted to cover up the fact that they had backdated option grants. To this end, Hovanec drafted and signed minutes that document a telephonic meeting of the Compensation Committee on December 17, 2003 that never occurred. Hovanec made it appear as though these minutes had been created contemporaneously with the December 17th meeting date.

111. In its Stock Options Restatement, Vitesse revised the measurement date for these grants to April 17, 2004, the date of the next Board meeting where the January 26th Compensation Committee meeting minutes were final and signed. Based on the closing price of Vitesse's stock on April 17th, these options were in the money on a per share basis by $0.08, and in the aggregate by $336,000. Hovanec signed the January 24th minutes, and Hovanec and Tomasetta signed the corresponding Grant Notices which contained the false grant date.

### 6. Tomasetta's and Hovanec's Attempt to Conceal Their Backdating Scheme in The Face of Media Inquiries During November 2005 to April 2006

112. In early November 2005, the *Journal* contacted Vitesse about the legitimacy of its option granting practices. After the *Journal's* inquiries, Mody contacted Vitesse's Outside Counsel. Outside Counsel told Mody not to destroy or create any documents, and then it reviewed some of the Company's Compensation Committee meeting minutes. In mid-November, Outside Counsel informed Mody that it was concerned because some of the minutes were backdated on their face, meaning that the option grant dates disclosed in the text were different from the meeting dates. During different phone calls, Outside Counsel repeated this concern to Hovanec and Tomasetta, and it specifically advised Tomasetta and Mody that Vitesse should conduct an independent investigation into the Company's option grant practices. In late November 2005, Outside Counsel informed Tomasetta that there might be very significant

41

charges to the Company's financial statements because certain stock option grants were not properly accounted for, and it warned him against signing Vitesse's upcoming filing of its Form 10-K for fiscal year ended September 30, 2005 unless he was certain that the Company's financial statements were accurate.

113.   Rather than follow Outside Counsel's advice, Tomasetta and Hovanec attempted to cover up their backdating practice by lying to Vitesse's board members and its Auditor, by creating and signing three bogus Compensation Committee meeting minutes to document grants at meetings that did not occur, and by Tomasetta recording two of these phantom meetings in his Palm Pilot.

114.   Specifically, in late November 2005, Tomasetta instructed Mody to draft two sets of Compensation Committee minutes, dated April 6 and October 2, 2001, which were the backdated grant dates for two large evergreen grants to employees and officers. In fact, as Tomasetta later admitted to counsel for Vitesse's Special Committee ("Special Committee Counsel"), Tomasetta had only recently signed the former, Hovanec the latter, and on November 22, Tomasetta arranged for the former head of Vitesse's Compensation Committee to sign both. On or about December 13, 2005, Hovanec directed the Assistant to draft another set of Compensation Committee minutes, which Hovanec signed, for a purported December 17, 2003 meeting that never occurred. December 17, 2003 represents the backdated grant date for another evergreen grant. All three of these minutes purport to document the granting of options on their respective dates. Vitesse's Compensation Committee, however, did not grant any options on these dates.

115.   After creating the two false 2001 Committee minutes, Tomasetta and Hovanec attended a December 6, 2005 Audit Committee meeting that was also attended by Mody, three

Vitesse directors, and Vitesse's Auditors. At this meeting, Mody presented a memo that Mody had prepared to document management's review of option grant practices during fiscal years 1996-2005. This memo, which all of the meeting participants discussed, assesses whether the Company's evergreen option grants were properly approved and accounted for in conformity with APB 25. The memo concludes that with the exception of the Company's fiscal year 1998 evergreen grant, all of Vitesse's other evergreen grants conformed to APB 25. The memo concludes that the 1998 evergreen grant had been inadvertently misdated to the same grant date as that year's directors' grant, and that the resulting unrecorded compensation expense was immaterial. Six days later, Tomasetta signed and certified Vitesse's fiscal 2005 Form 10-K which failed to properly record or disclose the compensation costs from the grants he and Hovanec had previously backdated. The following day, on December 13, Vitesse filed its 2005 Form 10-K with the Commission.

116.    During February and March 2006, the *Journal* began contacting Vitesse's directors to discuss the Company's option grant practices. In a series of emails between Tomasetta, Hovanec, Mody and several of Vitesse's directors, Tomasetta and Hovanec both falsely stated, in substance, that Vitesse set the exercise price of the Company's stock options according to the closing price of the stock on the date the directors approved the options. On March 18, 2006, the *Journal* published an article raising questions of possible backdating of CEO option grants at a number of public companies, including Vitesse.

117.    In early April 2006, a Special Committee of Vitesse's board hired the Special Committee Counsel to investigate the Company's prior stock option grants. Early in the investigation, Tomasetta and Hovanec tried to make it appear as though the two 2001 Compensation Committee meeting minutes they had created in November 2005 had been

prepared contemporaneously with their purported meeting dates. On April 12, Hovanec typed these two sets of minutes on Tomasetta's computer. Tomasetta and Mody copied them to a disc, and then from this disc Tomasetta copied them onto the Assistant's computer. With Mody and Hovanec watching, Tomasetta turned back the clock on the Assistant's computer so that the creation date for these two documents would match the oldest creation date associated with other meeting minutes found on the Assistant's computer. Tomasetta admitted to Special Committee Counsel that he had told Hovanec and Mody that this conduct "is the Martha Stewart thing, this is dumb, we need to stop - we're going to go to jail."

118.  Tomasetta eventually admitted to Special Committee Counsel the above facts concerning the recent creation and signing of the April 6 and October 2, 2001 minutes, including inserting them on the Assistant's computer and his comment about Martha Stewart and going to jail. Despite his admissions, Tomasetta falsely maintained that Vitesse had actually held Compensation Committee meetings on April 6 and October 2, 2001. Tomasetta also failed to acknowledge to Special Committee Counsel that he had entered the April 6 and October 2, 2001 Committee meeting dates in his Palm Pilot in November 2005.

C.  **THE INDIVIDUAL DEFENDANTS CAUSED VITESSE TO FILE MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS AND OTHER FILINGS**

   1.  **Annual Reports, Quarterly Reports, Registration Statements, and Sarbanes-Oxley Certifications**

119.  As a public company, Vitesse filed annual reports with the Commission that included audited financial statements certified by the Company's Auditor. As a result of the revenue and options backdating schemes alleged above, and in furtherance of such schemes, each of Vitesse's 10 annual reports on Forms 10-K for fiscal years ended September 30, 1996 to September 30, 2005 was false and misleading, as set forth below. Each of these annual reports

44

failed to include compensation expense for backdated and/or repriced stock option grants, and contained false and misleading accounting and other disclosures related to stock option grants. Further, each of Vitesse's five Forms 10-K for fiscal years 2001 to 2005 improperly reported revenue resulting from the revenue recognition fraud, and contained false and misleading disclosures related to Vitesse's revenue recognition practices.

120.   In each of its annual reports on Form 10-K for Vitesse's fiscal years ended September 30, 1996 through September 30, 2005 filed on October 25, 1996, December 29, 1997, December 23, 1998, December 23, 1999, December 19, 2000, December 17, 2001, December 18, 2002, December 16, 2003, December 10, 2004, and December 13, 2005, Vitesse disclosed that it accounted for stock options in accordance with APB 25. In each of its annual reports on Form 10-K filed on December 19, 2000, December 17, 2001, December 18, 2002, December 16, 2003, December 10, 2004, and December 14, 2005, Vitesse disclosed that it complied with FIN 44 and that it records compensation expense for stock options only if the market price of the company's stock exceeds the exercise price on the date of grant. In each of these annual reports, Vitesse did not report any compensation expense for stock options that it granted to employees, under the company's shareholder approved stock option plans, with an exercise price below the company's stock price on the date of grant.

121.   In its annual report on Form 10-K filed on October 25, 1996, Vitesse disclosed that under the Company's shareholder approved 1991 Stock Option Plan the exercise price for all stock options must be equal to the fair market value of its stock on the date of grant. This Form 10-K also discloses that under the Company's shareholder approved 1989 Stock Option Plan the exercise price for all incentive stock options must be equal to the fair market value of its stock on the date of grant and the exercise price for nonstatutory stock options must be at least 85% of the

45

fair market value of the Company's stock on the date of grant. In its annual reports on Form 10-K filed on December 29, 1997, December 23, 1998, December 23, 1999, December 19, 2000, December 17, 2001, December 18, 2002, December 16, 2003, December 10, 2004, and December 13, 2005, Vitesse disclosed that under all of the Company's shareholder approved stock option plans, "The exercise price of all stock options must be at least equal to the fair market values of the shares of common stock on the date of grant."

122.   In its annual reports on Form 10-K filed on December 19, 2000 and December 17, 2001, Vitesse disclosed that it recorded deferred compensation expense for stock options in connection with certain acquisitions. In its annual reports on Form 10-K filed on December 18, 2002, December 16, 2003, and December 10, 2004, Vitesse disclosed that it incurred compensation expense as a result of assuming the stock option plans, and related option grants, of certain companies that it had acquired. Vitesse disclosed in substantially similar words that, as a result, when reviewing such disclosed expense, "it appears that certain options were granted at less than fair market value, but which really represent grants given to employees of the acquired companies prior to their respective acquisitions by Vitesse. Other than the foregoing, all of the options grants made by Vitesse to employees and directors are granted at fair market value at the time of grant." Further, Vitesse disclosed in its annual report on Form 10-K filed on December 10, 2004 and December 13, 2005 that, "We have no options granted to employees in which the market price of the underlying stock exceeded the exercise price on the date of grant."

123.   Contrary to the representations that it made in paragraphs ¶¶ 120-122, Vitesse, through the actions of Tomasetta and Hovanec, was incurring substantial compensation expense as a result of granting in-the-money employee stock options under the Company's shareholder approved 1989 Stock Option Plan, 1991 Stock Option Plan and 2001 Stock Incentive Plan. In

46

the financial statements of each of Vitesse's Forms 10-K for fiscal years ended September 30, 1996 through September 30, 2005, Vitesse failed to record approximately $184 million in compensation expenses resulting from backdated and repriced option grants. These unrecorded expenses overstated Vitesse's annual pretax income or understated it annual pretax loss by between 1.7% and 45.7% in fiscal years 1996 through 2005, as identified specifically above, rendering the financial statements materially false and misleading.

124. In its annual report on Form 10-K filed on December 17, 2001 for the fiscal year ended September 30, 2001, Vitesse also disclosed that its revenue recognition policy for product sales was: "Production revenue is recognized when products are shipped to customers, which is when title and risk of loss transfers to the customer." Vitesse's annual reports on Form 10-K for the subsequent fiscal years 2002 through 2005 filed with the Commission on December 18, 2002, December 16, 2003, December 10, 2004, and December 14, 2005 state that Vitesse accounted for revenue from product sales as follows: "Production revenue is recognized when persuasive evidence of an arrangement exists, the sales price is fixed, products are shipped to customers, which is when title and risk of loss transfers to the customer, and collectability is reasonably assured." Each of Vitesse's annual reports for fiscal years 2001 through 2005 also state in substantially similar terms related to product sales to Nu Horizons, "Certain of the Company's production revenue are made to a major distributor under an agreement allowing for price protection and right of return on products unsold. Accordingly, the Company defers recognition of revenue on such products until the products are sold by the distributor to the end user."

125. Contrary to the representations that it made in ¶ 124, Vitesse improperly recorded revenue in material amounts in each of the financial statements included in these annual reports

47

on Form 10-K for its fiscal years 2001 through 2005, rendering the revenue and income reported in those financial statements, and the revenue recognition policies included in those reports for product sales and for sales to its major distributor, materially false and misleading. Vitesse also materially misstated the accounts receivable balances in the financial statements for certain of these years.

126. Tomasetta reviewed and signed each of Vitesse's annual reports on Form 10-K for the fiscal years 1996 through 2005 referenced in ¶¶ 120-124. Hovanec reviewed and signed each of Vitesse's annual reports on Form 10-K for fiscal years 1996 through 2004. Mody participated in preparing and reviewed each of Vitesse's annual reports on Form 10-K for fiscal years 2001 through 2005, and he signed the annual report on Form 10-K for fiscal year 2005. Kaplan participated in preparing and reviewed each of Vitesse's annual reports on Form 10-K for fiscal years 2001 through 2005.

127. Tomasetta and Hovanec knew, should have known, or were reckless in not knowing that each of the foregoing annual reports that they signed and reviewed materially misrepresented Vitesse's revenues, stock-based compensation expense, income, and in certain years accounts receivable, and made materially false and misleading disclosures and omitted material information about Vitesse's revenue recognition and stock option practices and policies.

128. Mody and Kaplan knew, should have known, or were reckless in not knowing that each of the foregoing annual reports that they participated in preparing, reviewed, and/or signed materially misrepresented Vitesse's revenues, income, and accounts receivable, and made materially false and misleading disclosures and omitted material information about Vitesse's revenue recognition practices and policies.

129. In addition, Vitesse filed 30 quarterly reports on Forms 10-Q between June 24, 1996 and February 8, 2006, which falsely reflect that Vitesse incurred no compensation expense for options granted to employees with exercise prices below the company's stock price on the date of grant and for options that were repriced. Nine of Vitesse's Forms 10-Q, filed from May 13, 2003 to February 8, 2006, falsely state that the Company applied APB 25 during the relevant time, and six of its Forms 10-Q, filed from February 13, 2004 to August 9, 2005, falsely state that Vitesse did not grant in-the-money options.

130. Thirteen of Vitesse's Forms 10-Q, filed from February 2002 to February 2006, falsely reflect overstated revenue, and thus income, and certain of these reports also contain overstated accounts receivable balances as a result of Vitesse's improper revenue recognition practices. Each of the 12 quarterly reports filed during March 31, 2002 through February 2006 also contain false and misleading revenue recognition policy disclosures that state in substantially similar terms that Vitesse recognizes product revenue when "products are shipped to customers, which is when title and risk of loss transfers to the customers." The four quarterly reports filed between February 2005 and February 2006 also contain the following false and misleading disclosure related to product sales to Nu Horizons: "Certain of the Company's production revenue are made to a major distributor under an agreement allowing for price protection and right of return on products unsold. Accordingly, the Company defers recognition of revenue on such products until the products are sold by the distributor to the end user."

131. Tomasetta reviewed all 30 of these quarterly reports on Form 10-Q. Hovanec reviewed and signed each of the 27 Vitesse quarterly reports filed with the Commission between June 24, 1996 and February 8, 2005. Mody participated in preparing and reviewed each of the quarterly reports that Vitesse filed with the Commission from February 14, 2002 through

49